LOPEZ *v.* WALKER.

4-9046                                              226 S. W. 2d 56

Opinion delivered January 23, 1950.

---

[5] The word "delivered" is not used in a legal sense.

*Lloyd E. Darnell, Campbell & Campbell* and *John H. Lookadoo,* for appellant.

*Hebert & Dobbs,* for appellee.

ED. F. McFADDIN, Justice.. This case involves the custody of a little boy, "Gerry" Walker, who was born in June, 1945. The appellant (now Mrs. Lopez) is the child's mother; the appellees (Mr. and Mrs. Roy H. Walker) are the child's paternal grandparents. We will refer to the parties as the "mother" and the "grandparents". The child's parents were divorced (on the grounds of indignities) in Garland County, Arkansas, on May 4, 1948; and the divorce decree recites:

". . . that defendant[1] shall have the custody of said child during the months of September to May inclusive of each year hereafter and the said paternal grandparents the custody of said child for the months of June, July and August of each year hereafter;"

On September 8, 1948, the mother filed petition for the exclusive custody of the child; but the grandparents resisted. The cause was heard by the Chancery Court on December 20, 1948, and a decree was entered refusing to change the previous custody order. The mother brings this appeal.

The law applicable to a case of this kind has been stated in many of our opinions. In *Blake* v. *Smith,* 209 Ark. 304, 190 S. W. 2d 455, we said:

"The party seeking a modification of a divorce decree awarding custody of a minor child assumes the burden of showing such a change in conditions as to justify such modification. *Kirby* v. *Kirby, supra,*[2] and *Seigfried* v. *Seigfried* (Mo. App.), 187 S. W. 2d 768."

In *Thompson* v. *Thompson,* 213 Ark. 595, 212 S. W. 2d 8, the late and beloved Mr. Justice ROBINS said:

"While any order as to custody of a child is subject to future modification by the court making it, the rule, uniformly adhered to by us, is that before such modifi-

---

[1] That is, the child's mother.
[2] 189 Ark. 937, 75 S. W. 2d 817.

cation may be made it must be shown that, after the making of the original order, there has been such a change in the situation as to require, in the interest of the minor, the change to be made, or it must be shown that material facts affecting the welfare of the child were unknown to the court when the first order was made. *Myers* v. *Myers,* 207 Ark. 169, 179 S. W. 2d 865; *West* v. *Griffin,* 207 Ark. 367, 180 S. W. 2d 839; *Miller* v. *Miller,* 208 Ark. 1058, 189 S. W. 2d 371; *Phelps* v. *Phelps,* 209 Ark. 44, 189 S. W. 2d 617; *Graves* v. *French,* 209 Ark. 564, 191 S. W. 2d 590.''

The evidence in the case at bar shows two changes in conditions, which, concurring as they do, clearly warrant an order awarding the mother the exclusive custody of the child. These two changes are: the changed situation of the mother, and the abduction of the child by the father.

I. *Changed Situation of the Mother.* During the entire life of the child, the father has been with him only a short time.[3] The mother, whose good character has never been questioned, was obliged to work; and for some time she and the child made their home with the grandparents (appellees). When she and the child lived elsewhere, she left him with ''professional caretakers'' while she was at work. Under such conditions, the division of custody was a reasonable agreement recognized by the court at the time the divorce decree was granted.

But on July 20, 1948, the mother married Dr. Joe Lopez, who is a graduate of Louisiana State University Medical School and has interned in several hospitals and worked at a public health center. In August, 1948, there was only one physician in the town of Amity, Arkansas, and he was advanced in years. The Lions' Club of Amity, as a community project, persuaded Dr. Lopez to locate there for the practice of medicine. He did locate in Amity in September, 1948; and at the time of the trial below had already established a practice which would gross him between ten and twelve thousand

---

[3] The grandfather (one of the appellees) said of the child: "He never knew his own Daddy. He would look at me and call me 'Daddy'."

dollars per year. Dr. and Mrs. Lopez have their home in Amity, and the child has his own room in that home. Mrs. Lopez is a regular attendant at Sunday School and Church. Friends and neighbors who have observed Dr. Lopez and Gerry together, from September 15, 1948, to the time of the trial below, gave most convincing testimony about the love of Dr. Lopez for the child. Jack Lacy, past president of the Amity Lions' Club, testified:

"Well, the doctor is very devoted to Gerry. In fact there are very few people in Amity but what think he is the father of the child. He carries him with him every place he possibly can, and they play and they romp together and I have never seen anything except a very close relationship between them. In fact he seems to be more devoted than most fathers and gives him more care, probably because he is a medical man and knows what is necessary, but he does seem to give him exceptional care and devotion."

Dr. Lopez testified:

"Q. Are you in a position to adequately provide for your wife and her son? A. Yes. Q. Do you want her to have full and complete custody of the child? A. Yes; I think it is really a necessity for the child's welfare and for her welfare. Q. What is your relationship with the child? Do you love the child yourself? A. He is to me just like he was my own son."

He further gave this evidence as to why divided custody was not for the best interest of the child:

"Q. What was the condition of the child when you first got him back, after he had been to Washington? A. Well, the child was pretty upset. We couldn't leave him alone at any time without him thinking that we were going to leave him. We had quite a good deal of trouble trying to convince him he would be safe in his own bed at night; he didn't want to go to sleep by himself because he had the idea his mother might not be there the next day or that he would probably be in a strange home, and he was definitely upset for about two

500

months after he got there. Q. What is his condition now, Doctor? A. I think he feels like he is in a home. He feels like he is in a place where he belongs. Q. Would you say the child is perfectly normal now? A. Yes, he is a perfectly normal child now.''

While each child custody case presents an individual and distinct problem, nevertheless, previous cases do serve to guide us in succeeding cases. *Miller* v. *Miller*, 208 Ark. 1058, 189 S. W. 2d 371, was a child custody case between the father and the maternal grandmother. By consent, the custody of the child had originally been awarded to the grandmother. Later the father remarried, established a home, and petitioned for the exclusive custody of the child. On the showing there made as to the best interest of the child, we awarded the custody to the parent in preference to the grandmother. A stronger case is made here for the custody to be awarded the mother: (a) because of the tender age of the child; and (b) because the mother, now happily remarried, has a home where the child may have the love and affection of his mother and the guidance of a stepfather who, as shown by his own testimony and that of other witnesses, is devoted to the child.

II. *Abduction of the Child By the Father.* In accordance with the May, 1948, decree, the grandparents had the custody of the child during June, July, and August of that year. They were to return him to the mother on September 1st. On August 30, the child's father[4] arrived in Hot Springs from Washington, D. C., and on the afternoon of August 31st he abducted[5] the child and took him to Washington, D. C. Mrs. Lopez had Ralph W. Walker arrested for kidnapping, but he resisted extradition. The grandfather went by airplane to Washington and brought the child back to Hot Springs. In short, the child's father (being the son of the appellees) deliberately spirited the child away from the grandparents, in order to keep them from returning the child

[4] The child's father is Ralph W. Walker, and he is the son of the appellees, Mr. and Mrs. Roy H. Walker.

[5] This abduction explains the nervousness of the child, as testified to by Dr. Lopez, and previously quoted.

to the mother the next day. The grandparents are good people. They love Gerry, and were in no wise parties to the unlawful actions of their son; but, nevertheless, Ralph W. Walker is their son, and they frankly state that they propose "to stand by him." If custody were awarded the grandparents for three months, then the child's father could easily repeat his unlawful performance; whereas he would certainly be somewhat deterred by the fact of the mother having the exclusive custody of the child.

## CONCLUSION

The record before us discloses a sincere love of the grandparents for the child. The record indicates that Mrs. Lopez will encourage the child to reciprocate such love, and that she will allow the child to visit the grandparents, and will invite them to visit the child in her home. We reverse the decree and remand the cause to the Chancery Court with directions to enter a decree awarding the exclusive custody of the child to the mother, Mrs. Lopez, conditioned that the grandparents, as well as the child's father, will have the right of visitation as that term is understood in such cases. This being an equity case, we are at liberty to award costs as we deem fair; and we have concluded that the appellant will pay the costs.